UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JIMMY RAY LACY,

                    Petitioner,                Case No. 2:14-cv-11120
                                                    Hon. Sean F. Cox

v.

CHANDLER CHEEKS,[1]

                    Respondent.

_____/

## OPINION DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

Jimmy Ray Lacy, a Michigan prisoner, filed this petition for writ of habeas corpus under 28 U.S.C. § 2254. Lacy was convicted following a jury trial in the Genesee Circuit Court of second-degree murder, MICH. COMP. LAWS § 750.317, felon in possession of a weapon, MICH. COMP. LAWS § 750.224b, and commission of a felony with a firearm. MICH. COMP. LAWS § 750.227b.

The case returns to this Court after an extended stay of proceedings to allow Lacy to pursue state post-conviction relief. The habeas petition and supplemental brief raise eleven claims. Because none of the claims merit habeas relief, the petition will be denied. The Court will also deny Lacy a certificate of appealability.

_____

[1] The Court substitutes the current Warden of Lacy's correctional facility as Respondent. *See* Habeas Rule 2(a).

# I.

## A.

The charges against Lacy arose from the shooting death of Marcus Moore outside Lacy's home in Flint, Michigan, on July 20, 2008. Terrence Williams, Lacy's neighbor, identified Lacy as the shooter but maintained that Lacy was defending himself. Moore's brother also identified Lacy as the shooter. Finally, Reginald Davidson, a jailhouse informant, claimed that Lacy confessed to him.

Relevant to Lacy's lead claim, asserting a violation of the right to a public trial, before the prospective jurors were brought into the courtroom at the start of trial, the trial judge stated:

> For those of you in the audience, once we get through these preliminary matters and we're bringing the jury up, you will have to stay outside. There is just not enough room for you and the jury, and in addition it would be improper for anyone who had some interest in this case to be seated among the jurors prior to their selection. So, when we get to that point, I'm going to have to ask you all to step outside until we do get the jury selected. Then you're welcome to come back in.
>
> ***
>
> Folks,  you're going to have to step out.  Let me tell you before you leave as well. During  the  course  of  the  trial  when  you  are  in here  if  you  leave,  you  can't  come  back  in  until  we  change  witnesses. Once we start a witness, you can't come in until we get to the next witness.  There's just - - we can't have the in and out traffic, and so be sure to be here when we get started, and know that  if  you  leave,  you can't  come  back  until  we  change  witnesses,  but  for  now  you're going to have to step outside.

(ECF No. 17-5, PageID.584, 592.)

2

At trial, Officer Rogelio Villarreal testified that he responded to the scene of a shooting at 117-121 West Eldridge in Flint sometime around midnight on July 20, 2008. When he arrived on the scene he spotted a body lying next to the driver's side door of a van. (*Id.*, PageID.719-720.) The victim, Marcus Moore, was declared dead when paramedics arrived. (*Id.*, PageID.726.) Villarreal observed shell casings in the front yards of 117 and 121 West Eldridge. (*Id.*, PageID.727.) Homicide Detective Leeann Gaspar arrived at the scene, and she also observed shell casings in the front yards. (*Id.*, PageID.752-63.)

The medical examiner testified that the deceased had sustain three gunshot wounds from the back. (ECF No. 17-6, PageID.792-93.) He had been shot in the back of the neck, the lower back, and the back of the right calf. (*Id.*, PageID.793.)

Officer Mitch Brown testified that the bullet casings *See*med to be spread in a line in the front yards and leading towards the van, suggesting the shooter advanced towards the van as he shot. (*Id.*, PageID.818, 829.) There were working streetlights that illuminated the scene that night. (*Id.*, PageID.823.) Brown described the lighting at the scene as fair to good. (*Id.*, PageID.825.)

Terrence Smith testified that he was Lacy's friend and neighbor. (ECF No. 17-7, PageID.887.) Smith was reluctant to testify because he believed that what happened on the night of the incident was not Lacy's fault. (*Id.*, PageID.888.)

Smith testified that he was standing in front of Lacy's house directly across the street at the time of the incident. (*Id.*, PageID.891-92.) Smith saw a van pull up in front of Lacy's house. (*Id.*, PageID.897.) Three guys got out of the van. (*Id.*, PageID.898.) The men caused a commotion and appeared to try to attack Lacy, who was standing on his driveway. (*Id.*, PageID.898-99.)

Smith testified that the guy who appeared to be the leader of the group was the one who got shot. (*Id.*, PageID.904.) It looked to Smith like the man put his hands on Lacy. (*Id.*, PageID.905.) Smith recognized the deceased from the neighborhood, but he did not know his name. (*Id.*, PageID.906.) Punches were thrown, and during the fight, gunshots rang out. (*Id.*, PageID.908.)

Smith saw Lacy with a gun in his hand when three or four shots were fired. (*Id.*, PageID.908-12.) Smith did not *See* anyone else with a gun. (*Id.*, PageID.914.) The leader fell after he was shot, and the other men ran away. (*Id.*, PageID.915-16.)

After the shooting, Lacy asked Smith to look after his dogs, and police staking out the house arrested Smith when he went to the house to feed the dogs. (*Id.*, PageID.919-20.) Smith understood that Lacy was staying at a motel after the shooting, which is why Lacy asked him to care for the dogs. (*Id.*, PageID.926.)

Smith heard that the deceased had asked to buy cocaine from Lacy, but Lacy didn't sell it – and that is what precipitated the argument. (*Id.*, PageID.936-39.) Smith said the deceased looked high and out of control. (*Id.*, PageID.939.) Smith

saw the same van come to Lacy's house two or three times earlier that day. (*Id.*, PageID.952.)

Aaron Williams testified that he was Moore's brother. (*Id.*, PageID.980.) The evening of the incident he went with Moore and another man to Lacy's house. (*Id.*, PageID.987-89.) Moore went to get powder cocaine, but he came back with crack cocaine. (*Id.*, PageID.990.) Williams identified Lacy as the person who brought out the drugs. (*Id.*, PageID.991.)

They left Lacy's house and picked up a fourth man named Bobby. (*Id.*, PageID.992.) They went to a party store to get more liquor, and then they returned to Lacy's house. (*Id.*, PageID.994-95.) By that point in the evening, Williams thought that he and Moore had each consumed two half-pint bottles of gin. (*Id.*, PageID.996.) The van arrived at Lacy's house a little before midnight. (*Id.*, PageID.997.) Moore wanted to buy more cocaine. (*Id.*, PageID.997.)

Moore got out of van in front of Lacy's house. Lacy and some other men were on the driveway. (*Id.*, PageID.999.) Williams did not hear any arguing, but when his brother started to walk back to the van, he heard several shots. (*Id.*, PageID.1001-03.) Williams saw Lacy holding a gun. (*Id.*, PageID.1004.) Lacy was walking down the hill of his front yard towards the street when the shooting occurred. (*Id.*, PageID.1004, 1018.) Williams ducked down during the shooting, and then he ran away from the van and called 9-1-1. (*Id.*, PageID.1007-10.)

Williams later identified a photograph of Lacy as the shooter at a police line-up. He testified, "when I seen his face, I immediately knew who he was … positive." (*Id.*, PageID.1014.) Williams was able to *See* Lacy "very well" at the time of the incident given the lighting conditions on the street. (*Id.*, PageID.1021.) Williams conceded that Moore was acting "wild and crazy" that night. (*Id.*, PageID.1052.)

Bobby Idom testified that he knew Moore. (ECF No. 17-8, PageID.1071.) Moore picked up Idom in his van the night of the incident. (*Id.*, PageID.1071.) Moore's brother was also in the van. (*Id.*, PageID.1072.) They bought and drank gin and then drove to a house on Eldridge. (*Id.*, PageID.1073.) Moore got out to talk to some men, and he got into an altercation. (*Id.*, PageID.1073.)

Idom was distracted and talking to Moore's brother. (*Id.*, PageID.1079-80.) Moore was acting "a little hyper." (*Id.*, PageID.1080.) Idom looked up and saw the altercation toward the top of the driveway. (*Id.*, PageID.1081.) Idom didn't know the men at the Eldridge house. (*Id.*, PageID.1082.) It seemed to Idom, though, that the men were shooing the victim away from the house. (*Id.*, PageID.1082.)

Idom got out of the van and told Moore to stop arguing and come back to the van. (*Id.*, PageID.1083.) Idom started to walk around the van when he heard gunshots. (*Id.*, PageID.1083.) Moore was heading back towards the van when the shots were fired. (*Id.*, PageID.1083-84.) Idom could not identify the shooter. (*Id.*, PageID.1085.)

Idom testified that as the victim got close to the van, his body started to drop and fall – he appeared to have been shot in the head or back. (*Id.*, PageID.1089.) Idom didn't see Moore punch anyone. (*Id.*, PageID.1091.) The altercation just involved finger pointing and hand gestures. (*Id.*, PageID.1091.)

Prior to the presentation of the jailhouse informant, Reginald Davidson, the prosecutor said that  defense counsel had given him several documents it would use during cross-examine. (*Id.*, PageID.1113-14.) The prosecutor said that the defense planned to use other documents signed by Davidson as well. (*Id.*, PageID.1114.) One document showed that Davidson was a paralegal. (*Id.*, PageID.1115.) Defense counsel stated, "my position as to Mr. Davidson, clearly he is a professional witness," and he was acting as Lacy's paralegal when Lacy allegedly made the incriminating statements to him. (*Id.*, PageID.1116.) Defense counsel also had Davidson's own case file, which showed that Davidson was requesting reconsideration of his sentence agreement in light of his testimony against Lacy. (*Id.*, PageID.1117.)

Reginald Davidson testified that he was an inmate awaiting sentencing at the Gene*See* County jail. While there, he provided legal advice to other inmates, including Lacy. (*Id.*, PageID.1133-34.)  Davidson testified that he was moved to the same floor as Lacy in December of 2008. (*Id.*, PageID.1134.) Lacy came to Davidson's cell, and he started asking him legal questions pertaining to his case. (*Id.*,

PageID.1134.) Among other things, Lacy asked Davidson for case law regarding the elements for murder. (*Id.*, PageID.1134-35.) As they talked more, Lacy provided Davidson with more details about his case. (*Id.*, PageID.1135.)

Lacy told Davidson that the deceased and his brother came to Lacy's house several times the day of the shooting, that they were buying drugs, and an argument broke out regarding drugs. Lacy said a friend of his, named Smith, saw him shoot the deceased. (*Id.*, PageID.1136.) The two talked about the victim's brother having been drunk as a factor in the case. (*Id.*, PageID.1137.)

Davidson explained that "as [Lacy] got more and more comfortable ... he was really telling me the details about what happened on Eldridge," including further details regarding the shooting. (*Id.*, PageID.1137-40.) There were two or three times when Lacy admitted to Davidson that he shot the victim. (*Id.*, PageID.1140-41.) At some point, Lacy started to threaten to kill Davidson and his mother. (*Id.*, PageID.1144.)

Davidson testified to his substantial criminal history. (*Id.*, PageID.1144-45.) At the time of his testimony, he was expecting a possible prison sentence. (*Id.*, PageID.1145. When asked if the prosecutor's office had promised him anything in exchange for his testimony in Lacy's case, Davidson answered, "No, they have not." (*Id.*, PageID.1145.) He explained that he was testifying because he had found God. (*Id.*, PageID.1145.)

When asked if he hoped to receive some type of consideration from the prosecutor's office for his testimony in the present case, Davidson testified, "Well, that's natural, and I talked to my attorney about that, and he tells me don't you worry about that, that's my job, and so it's natural to hope that once I move from the scale of justice that now I'm on the scale of mercy, and that I get some mercy." (*Id.*, PageID.1146.)

The prosecutor then elicited from Davidson the fact that his attorney had filed at Davidson's direction some papers with the court asking for sentencing consideration in light of his testimony against Lacy. Davidson responded, "I don't know if he's asked in advance for it. I know he's filed papers asking for consideration, yes, sir." (*Id.*, PageID.1146.) But asked whether the prosecutor actually promised Davidson anything in exchange for his testimony, Davidson answered, "not one minute." (*Id.*, PageID.1146.)

On cross-examination, Davidson testified that he had pled guilty to and was awaiting sentencing on charges including bank robbery, armed robbery, and firearm offenses, and he was looking at a maximum sentence of 20 years to life. (*Id.*, PageID.1147-49.) He had not been sentenced yet. (*Id.*, PageID.1149.) Defense counsel asked, "every time your sentence comes up, it's adjourned because they want to afford you the opportunity to testify in this case against Mr. Lacy, isn't that true?" Lacy answered, "I don't know if that's the reason. We had other reasons."

(*Id.*, PageID.1149-50.) Davidson denied that he was a "professional witness." (*Id.*, PageID.1150.)

Davidson acknowledged that he had charges in federal court, and with those too he did "expect and hope for leniency for any consideration that I get at any time." (*Id.*, PageID.1150-51.) With respect to his Genesee charges, Davidson testified that his plea deal called for a "worst case scenario" minimum sentence of nine years. (*Id.*, PageID.1151. This was because he had a plea deal regarding the sentencing guidelines. (*Id.*, PageID.1151.) Davidson acknowledged that he testified in federal court in two other cases. (*Id.*, PageID.1151.)

Defense counsel showed Davidson a document prepared by his defense attorney. (*Id.*, PageID.1152.) The document asked for a delayed sentence, conditional release, and bond reduction due to his cooperation in other cases. (*Id.*, PageID.1152.) It was filed after the plea had been entered. (*Id.*, PageID.1152.) Davidson maintained that his "Cobbs" (sentencing agreement) had nothing to do with Lacy's case. (*Id.*, PageID.1153.)

Davidson indicated that he provided the prosecution information on a number of cases. (*Id.*, PageID.1154.) Defense counsel named eight inmates that Davidson had helped. (*Id.*, PageID.1157-58.) Davidson acknowledged that he provided a document to the prosecutor's officer regarding Lacy. (*Id.*, PageID.1167.)

Defense counsel asked, "because of all the testimony and information you have provided on various other cases, you've had at least approximately 140 some months knocked off your proposed sentence?" Davidson answered, "I had that at issue ... that's what the Judge could do." (*Id.*, PageID.1175.) He explained that part of his Cobbs deal was to provide testimony on various other cases. (*Id.*, PageID.1176.) But Davidson explained that "Jimmy Lacy's case is outside the scope of my Cobbs. My Cobbs agreement was never made based on this case. I reached the arrangement - I reached my Cobbs outside of this case." (*Id.*, PageID.1177.)

Davidson testified that he was not going to be sentenced until after he testified in Lacy's case and in a federal case. (*Id.*, PageID.1179.) He admitted that it was "100 percent true" that he was trying to get below the nine years called for by the Cobbs deal through his cooperation in these additional cases. (*Id.*, PageID.1182.) Davidson "absolutely" anticipated his attorney asking for a reduction in his sentence based on his additional cooperation. (*Id.*, PageID.1182.)

On re-direct examination the prosecutor laid-out the terms of the Cobbs agreement with Davidson, which did not include anything about cooperating in Lacy's case. (*Id.*, PageID.1184.) Davidson testified, "You [the prosecutor] absolutely refused to [promise a reduced sentence]. You, specifically." (*Id.*, PageID.1184.)

Lacy called his neighbor, Toranda Riouse, as a defense witness. (ECF No. 17-9, PageID.1239.) She saw Terrence Smith at the scene on his bike after the shooting. (*Id.*, PageID.1245.)

Terrence Lacy testified for the defense that he picked up Lacy and took him to their aunt's house at about 11:00 p.m. on night of shooting, providing an alibi for Lacy. (*Id.*, PageID.1259.)

Shekela Robinson, Lacy's child's mother, also testified that Lacy was with her at the time of the shooting. (*Id.*, PageID.1283-84.)

Following arguments and instructions, the jury found Lacy guilty of the offenses indicated above.

## B.

Lacy filed a claim of appeal. His appellate counsel submitted an appellate brief to the Michigan Court of Appeals that raised the following claims:

I. Did the exclusion of the public from juror voir dire deprive Defendant of his federal and state due process rights to a public trial?

II. Did the admission of the victim's testimonial statement to the jury violate Defendant's Sixth Amendment right of confrontation?

III. Did the trial court improperly admit evidence that infers flight by Defendant from the crime scene and improperly instruct the jury on the issue of flight?

IV. Did the trial court err in admitting evidence of other crimes and misconduct by Defendant without prior notice by the prosecution

required in MRE 404(b)(2) and erroneously giving a cautionary instruction to the jury as to how such evidence should be evaluated?

V. Did the prosecutor's misleading and outcome determinative comments and vouching for hiss witness compounded by defense counsel's failure to object deny Defendant a fair trial?

VI. Did the trial court's failure to give cautionary jury instruction regarding eyewitness testimony and addict testimony result in a miscarriage of justice?

VII. Was counsel for Defendant ineffective as follows: (A) Defense counsel allowed the trial court to give the misleading and erroneous jury instructions on the issue of flight; (B) Defense counsel failed to request the appointment of an expert on eyewitness identification; (C) Defense counsel was ineffective by failing to object to the introduction of evidence of other alleged crimes and bad act evidence of Mr. Lacy; (D) Defense counsel was ineffective by failing to object to the prosecutor vouching for witnesses in his closing statement; and (E) Cumulative error.

VIII. Was the trial court's denial of Defendant's motions to quash and for directed verdict in error because the evidence used to support the conviction was insufficient?

IX. Did the cumulative effect of the errors in this matter deprive Defendant of his federal and state due process rights?

The Michigan Court of Appeals affirmed in an unpublished opinion. *People v. Lacy*, No. 295724, 2011 WL 891021 (Mich. Ct. App. Mar. 15, 2011). Lacy filed an application for leave to appeal in the Michigan Supreme Court that raised the same claims, but it was denied by standard form order. *People v. Lacy*, 800 N.W.2d 90 (Mich. 2011)(Table).

Lacy then returned to the trial court and filed a motion for relief from judgment and an amendment that raised the following claims:

I. Is Defendant entitled to a new trial where he was denied the effective assistance of trial counsel where counsel failed to object to: (a) improper jury instructions and a defective verdict form; (b) the testimony of a known government/jailhouse informant who intentionally elicited incriminating information from the Defendant not known to the prosecution; (c) the introduction of the non-testifying analyst's toxicology report, relied on by Dr. Wilson in her post-mortem examination, which found the sole cause of death to be homicide contrary to Defendant's Sixth Amendment right to confrontation; (d) call Defendant's aunts to corroborate his alibi defense, where Defendant claimed that he was at his aunt's house at the time of the events in issue, and (e) move for a continuance to investigate a material witness named Thomas Jeffries?

II. Was Defendant denied the effective assistance of appellate counsel and a full and fair appeal as of right where appellate counsel failed to raise the claims of error asserted herein?

III. Did the trial court violate Defendant's Sixth Amendment right to a jury trial by failing to properly instruct the jury and issuing a defective verdict form?

IV. Did the prosecutor violate Defendant's right to due process by failing to endorse a res gestae witness as required by MCL 767.40a, causing a judgment based on a partial presentation of the facts requiring a new trial?

V. Was Defendant denied due process of law and a fair trial where the prosecutor inappropriately introduced testimony of a known government agent at trial, who was placed in the housing unit with Defendant to obtain incriminating evidence, contrary to Defendant's Sixth Amendment right to counsel warranting a new trial?

The trial court denied the motion for relief from judgment under Michigan Court Rule 6.508(D)(2) in part, and on the merits. (Order; ECF No. 17-15.) Lacy

filed an application for leave to appeal in the Michigan Court of Appeals. The court

denied the application for lack of merit in the grounds presented. (Order; ECF No.

17-30, PageID.1883.) The Michigan Supreme Court then denied leave to appeal with

citation to Michigan Court Rule 6.508(D). *People v. Lacy*, 834 N.W.2d 503 (Mich.

2013)(Table).

Lacy then filed his federal habeas petition, raising what now form his first six

habeas claims. (Petition; ECF No. 1.) Lacy successfully moved to stay the case so

he could file a second petition for state post-conviction review. (ECF Nos. 5 and 9.)

Lacy filed a second motion for relief from judgment in the trial court and a

supplement that raised the following claims:

> I. Jimmy Ray Lacy's sentence was imposed in violation of Fifth and
> Sixth Amendment rights as set forth in *Alleyne v. United States*, 33 S
> Ct. 2151 (2013).

> II. Jimmy Ray Lacy was denied the effective assistance of trial counsel
> when counsel's total trial performance is considered as a substantive
> claim and as a defense to procedural default.

> III. Jimmy Ray Lacy was denied the effective assistance of appellate
> counsel as both a substantive claim and as a defense to procedural
> default.

> IV. Jimmy Ray Lacy is entitled to an evidentiary hearing on his claims
> that he was denied the effective assistance of trial and appellate counsel.

> V. Jimmy Ray Lacy, Jr. was denied a fair trial under the Fourteenth
> Amendment where a key state witness misled the jury as to the benefits
> received and expected in exchange for his testimony.

VI. Jimmy Ray Lacy, Jr. was denied his Sixth Amendment right to counsel when the Gene*See* County Prosecutor's Office used a jailhouse informant to circumvent that right.

The trial court denied the second motion for relief from judgment on the merits. (Order; ECF No. 17-24.) Lacy filed an application for leave to appeal in the Michigan Court of Appeals. The court denied the application for leave to appeal "for failure to establish that the trial court erred in denying the motion for relief from judgment." (Order; ECF No. 17-33, PageID.2164.) The Michigan Supreme Court denied relief with citation to Rule 6.508(D). *People v. Lacy*, 932 N.W.2d 621 (Mich. 2019)(Table).

Lacy subsequently returned to this Court and filed a supplemental brief in support of his petition, addressing what now form his seventh through eleventh habeas claims.

## II.

A § 2254 habeas petition is governed by the heightened standard of review set forth in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. To obtain relief, habeas petitioners who raise claims previously adjudicated by state courts must "show that the relevant state-court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191,

200 L. Ed. 2d 530 (2018)(quoting 28 U.S.C. § 2254(d)). The focus of this standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010)(internal citations and quotation marks omitted). Ultimately, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Additionally, a state court's factual determinations are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III.

### A.

Lacy's first claim asserts that he was denied his right to a public trial when the trial court closed the courtroom to the public during jury selection and then when it ruled that members of the public who left the courtroom during the presentation of testimony would not be allowed back until the next witness was called. Lacy also

claims in his ninth habeas claim that his trial counsel was ineffective for failing to object to the closure of the courtroom.

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... public trial ...." U.S. Const. amend. VI. "[T]his right extends to the States," *Presley v. Georgia*, 558 U.S. 209, 212 (2010), and under *Waller v. Georgia*, 467 U.S. 39, 48 (1984), the closure must be no broader than necessary to protect an overriding interest that is likely to be prejudiced without the closure. "[A] violation of the right to a public trial is a structural error," but "there are some circumstances when [courtroom closure] is justified," and the right to a public trial "is subject to exceptions." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908-1909 (2017). In short, not every public-trial violation leads to a fundamentally unfair trial. *Id.* at 1909, 1911.

Respondent asserts that review of the claim is procedurally defaulted because on direct review the Michigan Court of Appeals found that review was foreclosed by Lacy's failure to contemporaneously object to the closure of the courtroom. *See Lacy*, 2011 WL 891021, at *1.

It is well established in this Circuit that the failure of a Michigan defendant to object to the closure of the courtroom at his trial results in the procedural default of a public trial claim subsequently raised in a federal habeas petition. *See Williams v. Burt*, 949 F.3d 966, 973 (6th Cir. 2020); *Stalling v. Burt*, 772 F. App'x 296, 298 (6th

Cir. 2019); *Bickham v. Winn*, 888 F.3d 248, 251-52 (6th Cir. 2018); *Johnson v. Sherry*, 586 F.3d 439, 444 (6th Cir. 2009)(abrogated on other grounds).

To overcome this procedural bar to federal habeas review, a petitioner is required to demonstrate "cause" and "prejudice" for the failure to preserve the claim. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). Lacy asserts in his ninth claim that his counsel's failure to object to the closure of the courtroom constituted ineffective assistance of counsel and satisfies the cause requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000).

In the context of failing to object to the closure of a courtroom, however, the United States Supreme Court held that to demonstrate ineffective assistance of counsel, "the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or ... to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." *Weaver*, 137 S. Ct. at 1911.

Lacy has not attempted to show that there is a reasonable probability that the outcome of his trial would have been different had his attorney objected to the trial court's order. Nor does he develop any argument that the alleged public-trial violation here was so serious as to render his trial fundamentally unfair. This is not a case where the entire public was barred from a courtroom during trial. Rather, members of the public were excluded only during jury selection to accommodate the

19

pool of prospective jurors, and the record shows that later a single member of the public was temporarily barred from reentering the courtroom during the taking of testimony until the next witness was called. (*See* ECF No. 17-8, PageID.1241.) There is no reason to believe that this arrangement had any bearing on the outcome of the trial. So too, this was not a public trial violation that was so serious as to render the entire proceeding fundamentally unfair.

Accordingly, Lacy's first and ninth habeas claims do not present a basis for granting habeas relief.

## B.

Lacy's second claim asserts that his rights under the Confrontation Clause were violated by admission of the victim's out-of-court statements that he went to Lacy's house to purchase drugs and argued with Lacy regarding the purchase of drugs. The statements were testified to by Terrence Smith and Aaron Williams. Lacy asserts that because the statements "dealt with on-going criminal activity, it cannot be said that the comments could not be potentially [] used at a later criminal prosecution" and were therefore testimony statements. (Brief in Support of Petition, ECF No. 4, PageID.28.)

The Confrontation Clause bars the admission of "testimonial" statements of a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *Crawford v.*

*Washington*, 541 U.S. 36, 59 (2004). The Confrontation Clause applies only to testimonial hearsay and not to non-testimonial hearsay. *Davis v. Washington*, 547 U.S. 813, 823-24 (2006); *See also Whorton v. Bockting*, 549 U.S. 406, 420 (2007). Testimonial statements do not include remarks made to family members or acquaintances or statements made in furtherance of a criminal enterprise. *See Crawford*, 541 U.S. at 51-52, 56.

Admission of the victim's statement to his brother did not violate Lacy's confrontation rights. The statement was non-testimonial – it was made to a family member in a social setting, it was not made in anticipation of judicial proceedings. The purpose of the statements was for Moore to explain to the other men in the van why he was going to Lacy's house. With respect to Smith, the record suggests that he testified about statements he overheard during the argument outside the house leading to the shooting. (ECF No. 17-7, PageID.936.) Such remarks made to an adversary during an argument simply do not implicate the Confrontation Clause. *See Desai v. Booker*, 538 F.3d 424, 427 (6th Cir. 2008).

Lacy's second claim is without merit.

## C.

Lacy's third claim asserts that the trial court erred in instructing the jury. He asserts that the jury should have been read Michigan Criminal Jury Instruction 2d

(CJI2d) 5.7 regarding addict-informant testimony. Lacy also asserts that the jury was improperly instructed on the use of evidence of flight.

With respect to the failure to instruct the jury on addict-informant testimony, the Michigan Court of Appeals rejected the claim because, (a) though he testified that he consumed alcohol, there was no evidence indicating that Williams was an addict or an informant, and (b) the jury was read CJI2d 7.8 regarding general factors used to weigh the credibility of witnesses. *Lacy*, 2011 WL 891021, at *5-6.

With respect to the flight instruction, the court rejected the claim because: (a) there was evidence presented at trial that Lacy left his house after the shooting and stayed in a nearby motel, and (b) the instruction was modeled after CJI2d 4.4 and accurately stated state law regarding flight. *Lacy*, 2011 WL 891021, at *2.

When a federal habeas petitioner challenges a jury instruction given at his trial, he must show that the challenged instruction so infected the entire trial that the resulting conviction violates due process, not merely that the instruction was undesirable, erroneous, or even "universally condemned." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Petitioner must also show that the challenged instruction had a substantial and injurious effect or influence on the jury's verdict. *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008).

With respect to the failure to give the addict-informant instruction, Lacy cannot show that he was denied a fair trial by the absence of such an instruction. The

trial court gave the general instruction for evaluating the credibility of witnesses, and defense counsel both questioned Williams extensively regarding his alcohol and drug use and highlighted those facts during closing argument. On this record, Lacy cannot show that he was denied a fair trial by the absence of a specific, unrequested instruction on addict-informant testimony. *See Gonzalez v. Berghuis*, 2010 WL 3419825, at *1 (E.D. Mich. Aug. 27, 2010); *Winburn v. Curtis*, 2000 WL 33244272, at *14 (E.D. Mich. Jan. 31, 2001). This is particularly so where no "clearly established Federal law as determined by the Supreme Court," requires the giving of such a specific instruction. *See Reese v. Lafler*, 2009 WL 5217991, at *6 (E.D. Mich. Dec. 31, 2009).

With respect to the flight instruction, under Michigan law, flight is relevant to prove a defendant's consciousness of guilt. *Johnson v. Burke*, 903 F.2d 1056, 1062 (6th Cir. 1990). The flight instruction properly instructed the jury on an issue raised by evidence indicating that Lacy did not return home after the shooting and instead checking into a nearby motel. The instruction did not direct the jury to find that Lacy fled the scene. Rather, it directed jurors to make their own determination as to whether Lacy attempted to flee the scene and if so, what state of mind such flight revealed. *See Burton v. Renico*, 391 F.3d 764, 778 (6th Cir. 2004); *See also United States v. Carter*, 236 F.3d 777, 792 n. 11 (6th Cir. 2001).

Lacy's jury instruction claims do not merit habeas relief.

**D.**

Lacy's fourth claim asserts that the prosecutor committed misconduct when he: (a) asserted that Lacy fled the scene despite any evidence of flight, (b) elicited irrelevant testimony that Lacy was involved in dog fighting, and (c) vouched for the credibility of witnesses.

With respect to the prosecutor offering evidence of flight and asserting that Lacy fled after the crime, the Michigan Court of Appeals found the evidence was properly admitted pursuant to state law:

> After the shooting, defendant left the area on foot and, rather than returning home, which was being surveilled by the police, stayed at a hotel instead and asked Smith to feed the dogs at his house. This supports an inference that he was trying to avoid detection, and his alleged attendance at a barbeque the day after the shooting does not negate this inference.

*Lacy*, 2011 WL 891021, at *2.

With respect to dog fighting, the state court found that the unsolicited response by the witness did not affect Lacy's rights:

> Smith's reference to dog fighting was clearly not intentionally introduced by the prosecution. Rather, the reference was part of an unsolicited answer to an open-ended question designed to elicit the exact location of the altercation between defendant and the victim, and to access Smith's vantage point. Even though defendant did not object to the dog fighting reference, the trial court intervened and redirected the witness to identify the precise location.

*Lacy*, 2011 WL 891021, at *3.

Finally, with respect to vouching for witnesses, the court found that the prosecutor's comments were proper:

> Viewed in context, the challenged remarks did not suggest that the prosecutor had special knowledge that the witnesses were credible. The prosecutor's argument was a proper response to the defense implication and assertions during trial that the eyewitnesses were not credible. Further, even though defendant did not object, the trial court instructed the jurors that they were the sole judges of witness credibility, and that the lawyers' statements and arguments are not evidence.

*Lacy*, 2011 WL 891021, at *5.

A prosecutor's improper comments will be held to violate a criminal defendant's constitutional rights only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Prosecutorial misconduct will thus form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. *Donnelly v. DeChristoforo*, 416 U.S. at 643-45. To obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 567 U.S. 37, 48 (2012)(quoting *Harrington*, 562 U.S. at 103).

The Michigan Court of Appeals' determination that evidence of flight was properly admitted under state law forecloses Lacy's claim that the prosecutor was not permitted to comment on Lacy not returning to his home after the incident. It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Rulings regarding the admissibility of evidence are not questioned by a federal habeas court. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000). Given the evidence was properly admitted, the prosecutor fairly asserted that Lacy's failure to return home after the shooting and his checking into a motel constituted evidence of consciousness of guilt.

As to the dog-fighting testimony, the prosecutor was examining Terrence Smith about the location of the altercation leading to the shooting. When the prosecutor used a photo of the scene to ascertain the precise location, the following exchange occurred:

Q [Prosecutor]: You testified that there was – I think you may have used the word altercation. Is that correct, sir?

A [Smith]: Yes, sir.

Q: Where did this take place at exactly? Was it outside or inside 121?

A: Outside.

Q: Okay. Where exactly outside 121 was it at?

A: Going directly up the driveway, the side of the house in front of the door.

Q: Okay, is this at 121, sir?

A: Yes, sir.

Q: Okay. Where in the driveway did this altercation start?

A: Basically, right there were the dogs fight at.

Q: Can you repeat that?

The Court: Where the shadow of the driveway is. Right in there?

Q: In this area, sir?

A: Yes, sir.

(ECF No. 17-7, PageID.909-10.)

The state appellate court's determination that the dog-fighting remark was an unsolicited comment from a witness was a reasonable reading of the record. Nothing in the question suggested that the witness relate the location of the confrontation with other events that the witness may have observed there. Dog fighting had never been mentioned before this point in the proceedings. Brief, unsolicited, potentially prejudicial remarks such as this made by a witness do not merit relief. *See, e.g., United States v. Martinez*, 430 F.3d 317, 337 (6th Cir. 2005)(police officer's unsolicited testimony that defendant had previous arrests did not warrant new trial); *Zuern v. Tate*, 336 F.3d 478, 485-86 (6th Cir. 2003)(lay witness's unsolicited testimony that defendant was a "crazy man" who won't hesitate to murder again did

not warrant new trial). Furthermore, even if the questioning could reasonably have been fore*Seen* to elicit the comment, "isolated, inadvertent remarks on the part of the prosecution," do not constitute misconduct. *United States v. Brown*, 66 F.3d 124, 127-28 (6th Cir. 1995). The claim was reasonably rejected by the state court.

Finally, Lacy asserts that the prosecutor vouched for the credibility of Smith and Williams. A prosecutor may not express a personal opinion concerning the guilt of a defendant or the credibility of trial witnesses because such personal assurances of guilt or vouching for the veracity of witnesses by the prosecutor "exceeds the legitimate advocates' role by improperly inviting the jurors to convict the defendant on a basis other than a neutral independent assessment of the record proof." *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir.1999)(internal citations omitted). However, a prosecutor is free to argue that the jury should arrive at a particular conclusion based upon the record evidence. *Id.* "[G]enerally, improper vouching involves either blunt comments, or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *See United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)(internal citations omitted). To constitute reversible error, a prosecutor's alleged misconduct for arguing his or her personal belief in a witness' credibility or in a defendant's guilt must be flagrant and not isolated. *See United States v. Humphrey*, 287 F.3d 422, 433 (6th Cir. 2002).

Here, the prosecutor argued Smith was the "most … credible witness" because at the same time he identified Lacy as the shooter, he also very clearly conveyed his displeasure at having to testify for the prosecution due to his belief that Lacy shot the victim in self-defense. (ECF No. 17-9, PageID.1333.) Similarly, the prosecutor argued that the jury should find Williams' testimony credible because he acknowledged that he was engaging in the illegal activity of purchasing cocaine at the time of the shooting. (*Id.*, PageID.1326.) The prosecutor characterized this as something a person ordinarily would be reluctant to admit.

The record does not indicate that the prosecutor suggested he had a personal belief in the witnesses' credibility based on information not known by the jury. Rather, the argument was that the contents of the witnesses' other testimony made the incriminating portions more credible. That was not vouching, nor was it improper.

Lacy's fourth habeas case is therefore without merit.

### E.

Lacy's fifth habeas claim asserts that insufficient evidence was presented at trial to sustain his convictions. Specifically, Lacy argues that "there is no evidence of malice sufficient for a finding of second-degree murder. At best, the evidence shows an undisclosed discussion between Marcus Moore and Mr. Lacy, a shooting, and the subsequent death of Mr. Moore." (ECF No. 1, PageID.36.)

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). But the crucial question on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). A court need not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the requisite elements of the crime beyond a reasonable doubt. *Id.* at 318-19 (internal citation and footnote omitted)(emphasis in the original). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006)(internal quotation omitted); *See also Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008)("A conviction may be sustained based on nothing more than circumstantial evidence.").

A federal habeas court cannot overturn a state court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief

only if the state court decision was an objectively unreasonable application of the

*Jackson* standard. *See Cavazos v. Smith*, 565 U.S. 1, 2 (2011).

> The Michigan Court of Appeals rejected the claim on the merits:
>
> [W]hen the evidence is viewed in the light most favorable to the prosecution, it shows that defendant shot the victim three times in the back while the victim was walking away, striking the victim in the neck, lower back, and leg. This evidence is sufficient for a rational trier of fact to reasonably infer beyond a reasonable doubt that defendant possessed the required intent to kill for second-degree murder.

*Lacy*, 2011 WL 891021, at *7.

This decision was reasonable. The circumstances of the incident alone, viewed most favorably to the prosecution, allowed a rational jury to find that Lacy acted with an unjustified intent to kill when he shot the victim. As indicated, the circumstantial evidence suggested that the victim was shot three times from the rear as he walked back towards his van, and that the shooter was advancing in the same direction from behind him. The victim was shot in the neck and lower back, supporting a finding that the shooter intended to kill him. The fact that the victim was walking away from the shooter, albeit after an argument or brief physical confrontation, constituted strong circumstantial evidence that the shooting was not justified or excused. This claim was reasonably rejected by the state court and does not provide a basis for granting habeas relief.

**F.**

Lacy's sixth claim asserts that he was denied the effective assistance of trial counsel. Lacy argues that his counsel: (a) failed to object to the jury instruction on flight, (b) failed to obtain and call an expert witness on eyewitness identification testimony, (c) failed to object to the introduction of evidence that Lacy dealt drugs and that dog fighting occurred at his house, and (d) failed to object to the comments of the prosecutor discussed above.

After noting that Lacy had not supported his claim with a request for a hearing and stating the governing standard, the Michigan Court of Appeals rejected the claim on the merits. *Lacy*, 2011 WL 891021, at *6-7. The state court found that trial counsel was not ineffective for failing to object to the proper flight instruction or the proper comments made by the prosecutor. *Id.*, at 6. The court noted that counsel did object to the testimony regarding drug dealing, and that it was reasonable for counsel not to object to the isolated comment regarding dog fighting. *Id.* Finally, with respect to the failure to call an expert on identification testimony, the court stated:

> The trial court may appoint an expert witness for an indigent defendant upon request, but the defendant must show that the expert's testimony is required to enable the defendant to "safely proceed to a trial." MCL 775.15; *People v. Carnicom*, 272 Mich. App. 614, 616-617 (2006). Trial counsel was able to show that Williams had consumed a large amount of alcohol on the evening of the shooting, and counsel otherwise elicited a number of arguable bases for challenging the accuracy of the identifications. Defendant has not shown that he was prejudiced by the absence of an expert or that counsel was ineffective for failing to request one.

32

*Id.*

The decision of the state court was reasonable. To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two-prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.*

Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "'The likelihood of a different result must be substantial, not just conceivable.'" *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011)(quoting *Harrington*, 562 U.S. at 112). The habeas petitioner bears the burden of demonstrating prejudice under this standard. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

As for the claims regarding the admission of evidence, comments of the prosecutor, and jury instructions, the state court essentially found that these items were not objectionable. The failure to raise a meritless claim does not constitute

ineffective assistance of counsel. *See, e.g., Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008)("No prejudice flows from the failure to raise a meritless claim."). As discussed above, because the underlying claims are without merit, Lacy's counsel was not ineffective for failing to make objections.

Turning to the failure to call an expert witness on identification testimony, the claim was reasonably rejected for several reasons.

As an initial matter, Lacy presented no evidence either to the state courts or to this Court that he has or had an expert witness willing to testify regarding eyewitness identification. A habeas petitioner's claim that trial counsel was ineffective for failing to call an expert witness cannot be based on speculation. *See Keith v. Mitchell*, 455 F.3d 662, 672 (6th Cir. 2006). Petitioner also fails to offer any evidence as to the content of an expert witness's proposed testimony. In the absence of such evidence, Lacy is unable to establish that he was prejudiced by counsel's failure to call an expert witness. *See Clark v. Waller*, 490 F.3d 551, 557 (6th Cir. 2007).

Moreover, "no precedent establishes that defense counsel must call an expert witness about the problems with eyewitness testimony in identification cases or risk falling below the minimum requirements of the Sixth Amendment." *Perkins v. McKee*, 411 F. App'x 822, 833 (6th Cir. 2011); *See also Dorch v. Smith*, 105 F. App'x 650, 653 (6th Cir. 2004).

Here, although counsel did not call an expert witness on the problems of eyewitness identification, trial counsel attempted through cross-examination to discredit the eyewitnesses who identified Lacy. A chief problem with that effort and with this claim is that both eyewitnesses knew Lacy. Smith was Lacy's neighbor and friend. And Williams, though less familiar with Lacy, knew who he was because he and Moore had been to Lacy's house earlier that day to purchase cocaine. This was not a case of stranger identification. Finally, counsel attempted to counter the identification testimony by presenting alibi witnesses. *See Greene v. Lafler*, 447 F. Supp. 2d 780, 794-95 (E.D. Mich. 2006).

Lacy's ineffective assistance of counsel claim does not merit habeas relief.

## G.

Lacy's seventh and eighth claims are related and concern the testimony of jail-house informant Reginald Davidson. In his seventh claim, Lacy asserts that his trial was rendered unfair when the prosecutor failed to disclose and failed to correct false testimony regarding the benefits Davidson received in exchange for his testimony. Lacy's eighth claim asserts that Davidson was an agent of the State, and therefore his Sixth Amendment right to counsel was denied when Davidson elicited incriminating statements from Lacy.

With respect to the failure-to-disclose claim, Lacy's supplemental brief asserts that the prosecutor did not disclose that: (a) Davidson proposed in a letter

written to a prosecutor that he receive a one-year jail sentence in exchange for his testimony, (b) Davidson's prosecutor agreed to "split the baby " on his 108-month sentencing agreement if he testified against Lacy, and (c) Davidson was involved in the resolution of nineteen other armed robbery cases in Gene*See* County.

Lacy supports his claims by attaching numerous exhibits obtained from Davidson's state court case record, but leaving it largely for the Court to determine precisely how they could have been used to impeach Davidson:

- A letter from Davidson to the prosecutor in his case dated May 28, 2009, states he hoped to receive a one-year deferred sentence for his conviction plus counseling. The letter mentions the Lacy prosecution, but it does not state that his cooperation in that case was part of his plea bargain. (Ex. 2, ECF No. 13, PageID.169.)

- A motion for delayed sentence filed in Davidson's case states that the defense anticipated a delay due to his cooperation in a murder trial. (Ex. 3, *Id.*, PageID.175.) The motion states that the Cobbs agreement was for a sentence to start "no higher than 108 months," but "other factors in support and in addition remain incomplete." (*Id.*) The motion requested a conditional release due to threats. (*Id.*, PageID.176.)

- The written Cobbs agreement proposal notes Davidson's cooperation in the Thompson murder case, and the Underwood, Barr, and Kennedy cases. (*Id.*, PageID.179-87.) There is no mention of Lacy's case.

- The Davidson plea hearing, held on April 28, 2009, indicated that his sentencing would be adjourned for "further request for the Court's consideration to depart below those [Cobbs] guidelines." (*Id.*, PageID.192-93.) Davidson would be allowed to present mitigating "other stuff" to get below the Cobbs agreement. (*Id.*,

PageID.201.) There was no agreement or promise to go below the Cobbs evaluation, though. (*Id.*, PageID.201.)

- A September 23, 2009, motion for a delayed sentence also indicated that a request to depart below the Cobbs evaluation would be made, but there was no agreement to depart. (Id, PageID.215-18.)

- An October 2, 2009, hearing on Davidson's sentencing was adjourned until February 5, 2010, to "give us time yet to complete what we need to and enough time for the other things to transpire." (*Id.*, PageID.224.)

- In a July 13, 2010, letter from Davidson to the prosecutor, Davidson states, "On 4-23-09 I proffered with APA Mays and APA Phillips stated that if I pled and end up testifying in APA Mays *People v. Lacy* murder the following additional considerations would be granted: APA Philips would agree to 'split the baby' between the Cobb proposal argument to begin sentencing based on larceny of U.S. currency versus beginning sentencing at armed robber 108 months as pled (which defendant believed meant the people would agree sentencing would begin at the bottom of the guideline for unarmed robbery not counted any aggravating weapon enhancement). Also APA Philips said as part of the additional considerations that the state would not object to my arguments at sentencing. …. Attorney Millhouse informed me on 6-9-10 that he met with you and APA Curtis a few weeks before the June 8, 2010 hearing. He conveyed that he shared details based on information and belief as to why my testimony resulted in the conviction of Jimmy Lacy who received 37-70 years. He admitted that he failed to convey or argue 'concurrence for any of the additional consideration specifically' that APA Phillips stated on 4-23-09 based on my post plea cooperation…." (Id, PageID.234-35, 244-45.)

- At Davidson's October 22, 2010, sentencing hearing, the parties indicated that the Cobbs proposal was for a range of 108-180 months. (*Id.*, PageID.258.) The court said there was "no way in the world" Davidson would just be given only jail time. (*Id.*,

PageID.260.) Defense counsel indicated that "a non-prison solution was there but it was not my understanding that that was agreed upon …. It was [Davidson's] hope and his wish to make that argument." (*Id.*, PageID.262-63.) The prosecutor indicated that Davidson had assisted in solving the robbery of Judge Yuille's mother and he assisted in Lacy case. (*Id.*, PageID.265-66.) The defense stated it "wanted to give time for those acts to be completed so that he would have some actual thing to say to your honor, to come in and say I did this, I did that, please consider that as substantial and compelling reasons." (*Id.*, PageID.265-66.) The prosecutor stated it agreed to confirm that Davidson assisted in Lacy trial. (*Id.*, PageID.266.) But there was "nothing beyond that." (*Id.*) The court indicated that "so right now were at 108 unless you folks convince me to go below 108." (*Id.*, PageID.271-72.) Defense counsel argued that substantial and compelling reasons existed to go below the agreed range, including the help in Lacy case and other cases. (*Id.*, PageID.289-95.) The prosecutor acknowledged that Davidson "did assist with – I knew them as the Dynasty Crew, the robbers, in convincing them to come forward .... So I do believe he had earned some downward departure. (*Id.*, PageID.300-01.) In passing sentence, the court indicated that there were a "number or reasons for downward departure – including the defendant's cooperation in Lacy as well as other cases. (*Id.*, PageID.302.) The court sentenced Davidson to 70 to 240 months plus two years for the felony-firearm. (*Id.*, PageID.304-06.)

- A week later, on October 27, 2010, Davidson sent a letter to the court indicating that he was requesting resentencing because his attorney failed to ask for the "split the baby" deal to a 54-month sentence that the prosecutor agreed to on April 23, 2009. (*Id.*, PageID.313-14.)

- Davidson also executed an affidavit asserting that a "split the baby" promise for helping in Lacy's case had been made off of the record. (*Id.*, PageID. 316.)

- Davidson's defense attorney, Millhouse, also executed an affidavit indicating that prosecutor Phillips agreed that the 108-

month guidelines range as the largest possible minimum sentence, but that the range could go lower based on arguments that were made at sentencing. Millhouse also asserted that the prosecutor agreed to "split the baby" regarding any defense request for a lower sentence due to additional cooperation Davidson provided, including in Lacy's case, but he failed to assert that agreement during the sentencing hearing. (*Id.*, PageID.324-26.)

Starting first with Lacy's eighth claim that his Sixth Amendment right to counsel was violated by the conduct of Davidson in eliciting incriminating statements from him as a government agent, the trial court rejected the factual premise of the claim when it denied Lacy's first motion for relief from judgment:

Defendant argues that a witness, Reginald Davidson, was "a known government agent" and that allowing Davidson's testimony was a violation of defendant's right to counsel. Saying such does not make it so. This is a prime example of where a little knowledge can be dangerous. Mr. Davidson was not a "government agent." He was an armed robber. And, he was an armed robber who shared a cell with a murderer. A murderer, who, as it turns out, spilled his guts to the wrong person. This is not an uncommon occurrence. A jailhouse snitch does not become a government agent.

All of the circumstances regarding their conversations were placed before the jury. The jury may, or may not, have given Davidson's testimony any credence. There was certainly sufficient evidence without Davidson's testimony to convict the defendant. For the record, Davidson is currently serving up to 20 years for armed robbery. His sentence was not imposed by this Court.

(ECF No. 17-15, PageID.1558.)

Under established Supreme Court law, once a defendant's Sixth Amendment right to counsel has formally attached, a defendant is denied that right when law

enforcement officials "deliberately elicit" incriminating statements from him in the absence of his lawyer. *Massiah v. United States*, 377 U.S. 201, 206 (1964). However, the Sixth Amendment does not forbid the admission of a criminal defendant's statements to a jailhouse informant who may be placed in close proximity to the defendant in jail but who makes no effort to initiate or to stimulate conversations about the crime with which the defendant is charged. *See Kuhlmann v. Wilson*, 477 U.S. 436, 456 (1986). A defendant's Sixth Amendment right to counsel is "is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).

A criminal defendant thus does not show a violation of his Sixth Amendment right to counsel merely by showing that an informant, either through a prior arrangement with the police or voluntarily, reported his incriminating statements to the police. *Kuhlmann*, 477 U.S. at 459. *Massiah* is concerned with secret interrogation by investigatory techniques which are considered the equivalent of direct police interrogation. A defendant must demonstrate that the police and their informant took some action, beyond merely listening, which was designed deliberately to elicit incriminating remarks from the defendant. *Id.*

The trial court here rejected the contention that Davidson was a government agent tasked with engaging in a secret interrogation of Lacy to obtain incriminating

statements. Instead, the state court found that Davidson was simply a "jailhouse snitch," and Lacy "spilled his guts" to Davidson.

The trial record as well as the additional records filed by Lacy support the factual determination that Davidson was not acting as a government agent. Davidson testified that he was open to assisting other inmates at the jail with their cases, but he did not testify that the police or prosecutor solicited him to act as their agent. So, while the prosecutor and police might have been quite happy to receive information Davidson learned about other inmates' cases, and while they allowed Davidson to argue that any such information he provided could be used to further mitigate his sentence, there is indication in any of the records that he was acting as their agent. For example, there is no evidence of Davidson wearing a recording device, or of him giving regular interviews with police handlers, and there is no evidence that Davidson met with police prior to his interaction with Lacy during which they solicited his help in obtaining a confession. Instead, the record is consistent with the trial court's determination that Davidson, acting on his own initiative, hoped to benefit from information he learned from other prisoners at the jail.

An additional problem for Lacy is that the factual finding underlying the trial court's decision is entitled to substantial deference in this action. On federal habeas review, such factual findings may be reversed only on the basis of "clear and convincing evidence" to the contrary. *See* 28 U.S.C. §2254(e)(1); *Guidry v. Sheets*,

452 F. App'x 610, 613 (6th Cir. 2011). Lacy fails to proffer clear and convincing evidence that Davidson was acting as a government agent when Lacy made his incriminating remarks to him, or that Davidson undertook any action that was deliberately designed to elicit the incriminating remarks. Accepting the trial court's unrebutted factual findings, the evidence establishes that Davidson passively listened to Lacy's incriminating statements made to Davidson when Lacy was *See*king his legal advice. The record evidence indicates that it was Lacy who initiated the relationship. Therefore, the use of Lacy's statements to Davidson did not violate Lacy's right to counsel. *See Post v. Bradshaw*, 621 F.3d 406, 424-25 (6th Cir. 2010).

Lacy relatedly asserts in his seventh claim that the prosecutor suppressed evidence regarding the benefits Davidson was given in exchange for his testimony, and he failed to correct Davidson's false testimony that he received no benefit.

The trial court also denied this claim on the merits, finding that Lacy failed to establish the existence of any undisclosed impeachment material that was not revealed prior to trial:

> The Court does not find any evidence that would establish Mr. Davidson misled the jury as to the benefits he received and/or expected to receive for his trial testimony. His testimony was to the effect that he hoped for some leniency, but there were no promises. in fact, he did receive sentences below the guideline range. However, it is not all that uncommon for a charged defendant to receive a lesser sentence based on the defendant's willingness to testify in court against another individual charged with criminal behavior.

Davidson testified at the trial of defendant Lacy. Davidson testified that he hoped to receive some leniency for his testimony, but there had been no promises. If one were to read Davidson's sentence transcripts, it is clear from the discussion between the Court (Judge Farah), defense counsel, and the prosecutor, that there was an understanding that the defendant would receive consideration for his testimony in multiple cases, but that there was not an agreement as to the specific benefit he would receive prior to his testimony.

Issues regarding Davidson's testimony were raised in defendant's earlier motion for relief from judgment. (Exhibit 2, @ page 6) Defendant argued that Davidson was a "government agent" and that allowing Davidson to speak to the defendant without defendant's attorney present was a violation of defendant's right to counsel. That argument was not and is not persuasive. By all accounts, it was the defendant who sought out the assistance of Davidson, not the other way around.

The attorney who represented Lacy at his trial is a well-respected advocate in criminal cases. In fact, he was the attorney who represented the defendant in his earlier murder charge, obtained a hung jury, and negotiated a plea agreement without any additional jail time. His cross examination of Davidson covers thirty-six pages. During his cross examination, he uncovered the following facts and circumstances:

1. There were three cases pending against Davidson in Gene*See* County;

2. That the charges included bank robbery, armed robbery, weapon charges, including felony firearm;

3. That the maximum penalty for some of the charges could have been life in prison;

4. That Davidson expected leniency on his sentence because of his testimony in this trial, and in other cases pending in Gene*See* County;

5. That Davidson had assisted other inmates who had approached him for advice;

43

6. That Davidson had received a certificate as a paralegal through a correspondence class;

7. That Davidson had received a benefit that reduced his sentence by more than 10 years;

8. That Davidson would not be sentenced until he fulfilled his agreement to testify in the Lacy case;

9. That Davidson had at least 3 other felony convictions before being charged in the cases pending before Judge Farah; and

10. That, in exchange for his testimony against Lacy, Davidson expected a substantial downward departure in his sentence from what would be required under the guidelines.

All of the above testimony was presented to the jury through the cross examination of defendant's attorney. In reviewing the cross examination, the Court finds that defendant's attorney put before the jury all of the reasons why the jury could, or should, disregard Davidson's testimony. Upon review of the cross examination, this Court cannot find that defense counsel was not competent in his representation of the defendant.

The defendant also raises an issue with respect to a letter written by Davidson requesting a one-year deferred jail sentence for his crimes. This letter is of no consequence in this case in that no such sentence was imposed. For the record, Davidson was sentenced on eight separate charges. The maximum penalty for five of his convictions was 20 years.

(ECF No. 17-24, PageID.1666-68.)

This decision did not involve an unreasonable application of established Supreme Court law. In *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court held that "a conviction obtained through use of false evidence, known to be such by

representatives of the State, must fall under the Fourteenth Amendment." *Id.* at 269. The Supreme Court emphasized that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* To prevail on a claim under *Napue*, a habeas petitioner must show "(1) that the prosecution presented false testimony (2) that the prosecution knew was false, and (3) that was material." *Akrawi v. Booker*, 572 F.3d 252, 265 (6th Cir. 2009)(quoting *Abdus-Samad v. Bell*, 420 F.3d 614, 625-626 (6th Cir. 2005)). "The subject statement must be 'indisputably false' rather than 'merely misleading.'" *Id.* (quoting *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000)).

Next, in *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution." *Id.* at 87. More recently, the Supreme Court clarified that the prosecution's duty to disclose exculpatory evidence "is applicable even though there has been no request by the accused" and that the duty extends to evidence "known only to police investigators and not to the prosecutor." *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999).

"In order to establish a violation of *Brady*, [a habeas petitioner] must show that the following three requirements are met: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;

that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011)(en banc)(quoting *Strickler*, 527 U.S. at 281-82). Evidence is "material" under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280.

Finally, in *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court held that "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility" will "justif[y] a new trial irrespective of the good faith or bad faith of the prosecution." *Id.* at 154 (quotation omitted). *Giglio* and its progeny make clear that the prosecution's duty to disclose under *Brady* extends to "impeachment evidence as well as exculpatory evidence." *United States v. Bagley*, 473 U.S. 667, 676 (1985).

Here, Lacy claims that the prosecutor failed to disclose or allowed Davidson to falsely testify regarding three items. First, Lacy refers to a letter Davidson wrote to the prosecutor that proposed he receive a one-year jail sentence in exchange for his testimony against Lacy. Next, Lacy claims there was an additional off-the-record agreement by the prosecutor that he would "split the baby" and cut in half the 108-month sentencing agreement in exchange for Davidson's testimony against Lacy.

Lastly, Lacy claims that the prosecutor failed to disclose that Davidson was involved in the resolution of numerous other armed robberies in Genesee County.

None of these arguments have merit. Nothing in the record suggests that counsel was unaware of the Davidson's moves to further reduce his sentence in light of his testimony against Lacy, nor of his assistance in the other robbery cases. And the record contradicts the claim that a secret additional "split the baby" 54-month sentencing agreement existed with Davidson.

With respect to Davidson's letter to the prosecutor expressing a desire to receive a one-year deferred sentence, Lacy fails to explain how this constitutes undisclosed impeachment evidence. The letter does not indicate that the prosecutor agreed, proposed, or argued for Davidson to receive such a sentence in exchange for his testimony. Rather, the letter was in line with Davidson's trial testimony that, though he had not been promised anything in exchange for his testimony because it was not part of his Cobbs agreement, he was hopefully that his assistance in Lacy's case would result in a further lowering of his sentence. The letter was merely part of his bid to receive that hoped-for and testified-to benefit. Moreover, defense counsel admitted as an exhibit at trial Davidson's motion for delayed sentence that expressed a similar argument for a sentence lower than called for by the agreement. (*See* ECF No. 17-8, PageID.1155.) If Davidson's letter was not disclosed by the prosecutor

(and Lacy proffers no evidence that it was not disclosed) it did not contain additional impeachment material beyond what was contained in the motion.

Next, with respect to Davidson's alleged assistance in nineteen other Genesee robbery cases, the record does not support the suggestion that these were cases similar to Lacy's, where Davidson acted as a jail house informant. The basis for the allegation comes from a December 22, 2011, affidavit executed by a defendant in one of the other cases. (ECF No. 13-16, PageID.319-320.) The affidavit clarifies that the affiant and his co-defendant went to Davidson for help regarding their charges, and at Davidson's urging, the co-defendant wrote a letter to the prosecutor "confessing to over 19 armed robberies." (*Id.*, PageID.320.) In other words, unlike Lacy's case, Davidson in these other cases convinced the defendants to confess their own guilt to the authorities.

Lacy thus mischaracterizes the nature of this allegedly undisclosed information. This was not another case in which Davidson testified against other defendants or acted as a jailhouse informant. Rather, the affidavit indicates that Davidson convinced two other men involved in the other cases to come forward on their own and confess. And apparently, all the cases were all resolved by plea. (*Id.*, PageID.329.) Nothing revealed in the affidavit, therefore, is inconsistent with Davidson's testimony in Lacy's trial. Nor does Lacy explain how Davidson convincing other inmates to confess could have been used to impeach his credibility.

Query whether it would have benefitted Lacy for defense counsel to have asked Davidson at trial, "Isn't it true you convinced two other inmates to confess their own guilt in other robbery cases and they did so?" An affirmative answer would not have undermined Davidson's credibility. The information that Davidson persuaded other defendants to plead guilty, even if not disclosed, was not material to Lacy's defense.

Finally, Lacy asserts that there was one concrete off-the-record promise made by the prosecutor to Davidson that was not disclosed at trial. He asserts that there was a secret agreement between the prosecutor and Davidson that if Davidson testified in Lacy's case the prosecutor would "split the baby," which the Court understands means that the prosecutor would agree to a maximum 54-month minimum sentence instead of a maximum 108-month minimum sentence. This argument is at least supported by Davidson's and his defense counsel's affidavits filed in Davidson's case that such an additional agreement existed. (*See* ECF No. 13, PageID.314, 326.)

The problem with the argument, however, is that it is apparent from Davidson's sentencing hearing transcript that there was no such "split the baby" agreement. The prosecutor did not, in fact, agree to Davidson's request for a sentence with a minimum term no greater than 54 months. Neither defense counsel nor Davidson, who allocated on his own at length, asserted that any such additional agreement existed. And the court actually sentenced Davidson to 70-240 months,

plus a consecutive two years for the firearm conviction, all in keeping with the on-the-record agreement. (*Id.*, PageID.304-06.)

At bottom, this allegation is supported only by documents prepared by Davidson to support his own bid for a lower sentence after his own sentencing hearing. Lacy provides no evidence that Davidson's assertions about a "split the baby" agreement actually existed or were accepted as existing by the state court. All that Lacy has shown is that after Davidson was sentenced, he filed papers *See*king to further reduce his sentence by asserting the existence of an additional off-the-record promise. There is also a purported affidavit from Davidson's attorney, but no plausible explanation has been offered for why—if such a deal existed—it was not asserted by Davidson or his counsel at the sentencing hearing. Such after-the-fact claims of additional secret deals are commonplace, and Lacy has come nowhere near establishing that such a promise existed and was not disclosed to Lacy.

The Court has reviewed all the exhibits proffered by Lacy in support of this claim. None of them reveal the existence of additional impeachment evidence against Davidson that was material to Lacy's defense. Rather, the documents confirm Davidson's testimony that his cooperation at Lacy's trial was not part of any agreement with the prosecutor, and that he merely *hoped* his cooperation would lead to a receive a further sentence reduction.

Accordingly, the state court record when considered along with the evidence proffered by Lacy in support of his seventh and eighth claims do not support his claims that his constitutional rights were violated in relation to Davidson's testimony. These claims were reasonably rejected by the state courts.

## I.

Lacy's tenth claim asserts that he was denied the effective assistance of appellate counsel. He asserts that his appellate counsel failed to raise the foregoing claims regarding Davidson's testimony, and he failed to raise a claim challenging his trial counsel's failure to object to the closure of the courtroom.

The Court has already determined that those underlying claims are without merit. Appellate counsel cannot be ineffective for a failure to raise an issue on appeal that lacks merit. *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001); *Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008)("No prejudice flows from the failure to raise a meritless claim."). Lacy therefore fails to demonstrate entitlement to relief based on this claim.

## J.

Lacy's eleventh claim asserts that he is entitled to an evidentiary hearing on his claims. AEDPA forecloses the demand. Where, as here, the state court rejected a petitioner's habeas claims on the merits, federal review is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v.*

*Pinholster*, 563 U.S. 170, 181 (2011)(citing 28 U.S.C. § 2254(d)(1)). Nor may the Court grant a hearing on the ground that the state courts did not afford one to Lacy during state review proceedings, or based on the argument that the state court adjudication of the claims without a hearing rendered it unreasonable. *See Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013). To the extent Lacy challenges the state courts' decisions to deny him an evidentiary hearing on his claims under state procedures allowing for a hearing, the argument is not cognizable because it concerns a claimed violated of state court post-conviction review procedures. *See Hayes v. Prelesnik*, 193 F. App'x 577, 584-85 (6th Cir. 2006). Lacy's request for an evidentiary hearing is therefore denied.

## IV.

For the reasons stated, the Court concludes that Lacy fails to establish entitlement to habeas relief with respect to any of his claims. Accordingly, the Court **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Lacy may appeal this decision, the Court must determine whether to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a

different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)(citation and internal quotation marks omitted). Lacy has failed to make this showing. Accordingly, the Court **DENIES** a certificate of appealability.

**IT IS SO ORDERED.**

s/Sean F. Cox
Hon. Sean F. Cox
United States District Judge

Dated: March 23, 2022

53